IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
RHONDA L. BAYSINGER,           )
            Plaintiff,         )
                               )
         vs.                   )  Civil Action No. 05-367
                               )  Judge Terrence F. McVerry/
JO ANNE B. BARNHART,           )  Magistrate Judge
                               )  Amy Reynolds Hay
Commissioner of Social         )
Security,                      )
            Defendant.         )
```

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

        It is respectfully recommended that plaintiff's motion
for summary judgment (Docket No. 7) be denied, that defendant's
motion for summary judgment (Docket No. 9) be granted, and that
the decision of the Commissioner be affirmed.

II.  REPORT

        On March 18, 2005, plaintiff, Rhonda L. Baysinger,
submitted the instant complaint pursuant to 42 U.S.C. § 405(g)
and 1383(c)(3) seeking review of the Commissioner of Social
Security's final decision disallowing her claim for disability
insurance benefits ("DIB") and supplemental security income
("SSI") under Titles II and XVI of the Social Security Act ("the
Act"), 42 U.S.C. §§ 401-433, 1381-1383f.

A.   Procedural History

        This is apparently plaintiff's fifth application for
DIB and SSI.  Her previous applications were filed in 1986, 1992,
1995, and 1996, all of which were denied and not appealed
(Tr. 17).

        The present application, in which plaintiff alleges a
disability since January 23, 2003, was protectively filed on
March 27, 2003 (Tr. 74-79, 290-92).  Benefits were denied on July
24, 2003, and on August 5, 2003, plaintiff requested a hearing
(Tr. 60-66, 293).  A hearing, at which plaintiff was represented
by counsel, was held before an Administrative law Judge ("ALJ")
on July 21, 2004 (Tr. 33-59).  On October 27, 2004, the ALJ found
that plaintiff's residual functional capacity did not preclude
her from performing work existing in significant numbers in the
national economy and concluded that she was not disabled
(Tr. 17-26).

        The Appeals Council denied plaintiff's request for
review on January 28, 2005, thereby rendering the ALJ's decision
the final decision of the Commissioner (Tr. 8-12).  This appeal
followed and the parties' cross-motions for summary judgment are
presently before the Court.

B.   Factual Summary

        The claimant was forty-four years old at the time of
the ALJ's decision (Tr. 18).  She was graduated from high school

and had worked as a cashier and stock person but has not worked since January 23, 2003, reportedly due to low back, left hip, and left knee pain, and left foot drop (Tr. 42-45, 89).

At the hearing conducted on July 21, 2004, plaintiff testified that she is able to drive and cook, dress and bath herself, and that she grocery shops with her son's assistance, goes to the bank, mops her floors, watches television, and does word search puzzles (Tr. 40, 41, 46, 52-53). In addition, plaintiff testified that since her back surgery in 1995 her back only bothers her "now and then" at which time she takes Tylenol and that she is not getting any treatment for her back (Tr. 42, 52). As well, although plaintiff developed foot drop following knee replacement surgery in September of 1993, she allowed that it improved with physical therapy and that she is able to walk with a brace (Tr. 44, 45, 48, 49). Plaintiff also stated that her hip bothers her and that she lays down twice a day for one to two hours to relieve the pressure (Tr. 42, 46-47). The only prescribed medication that plaintiff uses, however, is Albuterol for her bronchial asthma which she uses three or four times a month (Tr. 46-47, 52).

A Vocational Expert ("VE") was also called to testify at the hearing and categorized plaintiff's past work as a cashier as light and unskilled (Tr. 24, 53). In response to a

hypothetical question involving a younger individual[1] with
plaintiff's education and work experience who was physically
precluded from performing all but sedentary work in a controlled
environment with a sit/stand option, only occasional postural
movements, no use of foot pedals, and no exposure to hazards, and
mentally limited to unskilled, entry level, low-stress work
defined as one and two-step processes, routine and repetitive
tasks, primarily working with things rather than people, the VE
testified that such an individual could perform work such as hand
packer, sorter/grader, and assembler and that such positions
exists in significant numbers in the national economy (Tr. 54).

As well, certain medical evidence was considered.
In September 1995, Jory Richmond, M.D., performed a lumbar fusion
and laminectomy/foramenotomy at L5-S1 (Tr. 115-20, 143).  At
post-operative follow-up visits, plaintiff reported "excellent"
and "dramatic" relief of her back and leg pain, noting that the
pain had entirely resolved (Tr. 116, 140-43).  While plaintiff
reported intermittent back pain at her one-year follow-up visit,
it was noted that she was functioning "quite well," that x-rays
revealed a solid fusion at L5-S1, and that the physical
examination revealed no neurological deficits (Tr. 137).

---

[1]     At forty-four years old, plaintiff is a "younger person"
under the Commissioner's regulations.  20 C.F.R. §§
404.1563)c), 416.963(c) (2004).

Plaintiff presented to Andrew S. Kaye, M.D., on April 29, 2000, four years after her back surgery (Tr. 145).  She had been doing fairly well until the previous two weeks (Tr. 145).  While plaintiff denied any pain in her lumbar spine or legs, she reported "subjective numbness" in her legs bilaterally (Tr. 145).  Dr. Kaye's physical examination revealed full hip range of motion, and normal strength, reflexes and sensation (Tr. 145).  Overall, Dr. Kaye's physical examination revealed "very little abnormality" (Tr. 145).  Dr. Kaye recommended a Decadron IV and evaluation by a neurologist to determine the etiology of her complaints (Tr. 145).  A CT scan of plaintiff's lumbar spine revealed no obvious abnormality aside from post-surgical changes and anterolisthesis of L5 on S1 (Tr. 146).

On August 28, 2002, plaintiff presented to the emergency room with a twisted left knee (Tr. 147-50).  X-rays were unremarkable other than some degenerative changes (Tr. 153).  The attending physician diagnosed left knee strain, and prescribed a knee immobilizer (Tr. 149).  While plaintiff was given a work excuse for the following day, she was thereafter cleared for light duty that involved no prolonged standing or walking, and no climbing, bending, or stooping (Tr. 149).  The following month, a lower extremity MRI revealed a medial meniscus tear (Tr. 165).

In light of the MRI results, Lawrence Bell, M.D., performed a left knee arthroscopy, partial medial meniscectomy, and debridement of articular cartilage damage on October 2, 2002 (Tr. 155, 163, 167). While plaintiff complained of post-operative nausea and left knee pain, the physical examination revealed intact cranial nerves and 5/5 strength throughout (Tr. 156-57). Within three weeks of the knee procedure, plaintiff reported "marked improvement" and "quite a bit of relief" of her knee pain (Tr. 166). Dr. Bell's physical examination revealed good quad strength, good flexion, and no instability (Tr. 166).

Dr. Bell prescribed a course of physical therapy, which commenced on October 15, 2002 (Tr. 175). During the initial evaluation, plaintiff ambulated independently with an antalgic gait but without the use of an assistive device (Tr. 175). The following week, plaintiff reported that muscle relaxers and anti-inflammatories had significantly decreased her pain (Tr. 173). While she was still limited, the medications allowed her to ambulate well and complete her activities of daily living (Tr. 173). By the end of October 2002, plaintiff returned to normal duty at work and was tolerating it well (Tr. 172). While plaintiff continued to experience some pain, she was discharged from physical therapy on November 18, 2002, having achieved "good" progress (Tr. 169).

On November 21, 2002, Bernard Hirsch, M.D., from the physical rehabilitation clinic examined plaintiff (Tr. 183). Dr. Hirsch noted that plaintiff was currently working and could negotiate around the knee discomfort because she was working the evening shift with appropriate rests in between activities (Tr. 183). The physical examination revealed some limited flexion and minimal swelling for which Dr. Hirsch prescribed Cataflam and Darvocet (Tr. 183).

Plaintiff returned to Dr. Hirsch on January 16, 2003, reporting continued pain (Tr. 183). Because x-rays revealed marked arthritic changes, Dr. Hirsch recommended a total knee replacement (Tr. 183, 262). On April 10, 2003, Dr. Hirsch completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare indicating that plaintiff was permanently disabled from all work (Tr. 184-85).

On June 19, 2003, Jay Kim, M.D., performed a consultative examination and completed a range of motion chart and a medical source statement at the state agency's request (Tr. 199-205). Plaintiff complained of back and knee pain and numbness in her left hip and leg and stated that although she was able to perform her activities of daily living by herself she did so with some difficulty (Tr. 199-200). Dr. Kim's physical examination revealed left knee swelling and decreased range of motion (Tr. 200, 202). Plaintiff's right lower extremity was

7

neurologically intact (Tr. 200, 202).  Although plaintiff walked with a limp on the left side, she required no assistive device (Tr. 200).  In addition, although lumbar forward flexion was limited to 70 degrees, lateral flexions were within normal limits at 20 degrees (Tr. 201-02).  Dr. Kim concluded that plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and walk one hour or less in an eight-hour workday, sit eight hours with the option of alternating sitting and standing, occasionally bend, stoop, and climb ladders, but never kneel, crouch, or balance (Tr. 204-05).

State agency physician K. Loc Le, M.D., prepared a physical residual functional capacity assessment on July 11, 2003 (Tr. 187-96).  Based on his review of the evidence, Dr. Le concluded that plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and occasionally engage in postural movements (Tr. 188-89).  Dr. Lee disagreed with Dr. Kim's standing, walking, and sitting limitations as unsupported by the medical evidence in the file which revealed no neurological deficits and independent walking (Tr. 196).

Dr. Hirsch performed a left total knee replacement on September 2, 2003 (Tr. 236, 239-40), and at a September 15, 2003

follow-up appointment, noted a post-operative foot drop (Tr. 260).

On November 5, 2003, Dr. Hirsch performed a successful left knee manipulation (Tr. 229, 259). Once Plaintiff was anesthesized, plaintiff's knee "without much effort at all went back to 120 degrees without any difficulty," and no instability ensued (Tr. 229). The following week, plaintiff enrolled in another course of physical therapy for knee pain and the left foot drop (Tr. 221, 231). At a December 2003 follow-up appointment, Dr. Hirsch reported that plaintiff's condition had "markedly improved" and that the peroneal nerve responsible for the foot drop was improving (Tr. 259). Plaintiff's physical therapist also noted greater foot control and knee range of motion (Tr. 218). By March 22, 2004, plaintiff's physical therapist reported significant improvement (Tr. 215).

On June 22, 2004, Dr. Hirsch completed a medical source statement of plaintiff's ability to perform work-related activities (Tr. 268-69). Dr. Hirsch opined that plaintiff could occasionally lift and carry ten pounds, frequently lift and carry two to three pounds, walk for one hour or less, sit for eight hours with a sit/stand option, must avoid lower extremity pushing and pulling, could occasionally bend, but could never perform other postural movements (Tr. 268-69).

Dr. Hirsch ordered a lumbar spine MRI on July 13, 2004 (Tr. 280). While the examination was limited due to the prior

internal fixation, there were no significant focal abnormalities seen at either the L2-3 or L3-4 levels (Tr. 280).

It also appears that certain psychological test results were in evidence. Specifically, an IQ test performed in 1967 revealed IQ scores of 85 and 93 (Tr. 112). Plaintiff's high school also administered IQ testing in March 1976, when plaintiff was sixteen years old, at which time she received a full scale IQ of 72, a verbal IQ of 68, and a performance IQ of 80 (Tr. 111).

In April 1994, when plaintiff was 33 years old, psychologist John Brescia, M.A., conducted a psychological evaluation and testing, which included the Wechsler Adult Intelligence Scale-Revised (WAIS-R), the Purdue Pegboard, the Revised Minnesota Paper Form Board Test, the Differential Aptitude Test, Wide Range Achievement Test (WRAT), and Career Assessment Inventory (Tr. 206-10). On the WAIS-R, plaintiff achieved a full scale IQ of 76, a verbal IQ of 74, and a performance IQ of 82, placing her within the borderline range of intellectual functioning (Tr. 207). Based on his evaluation, Dr. Brescia felt there were numerous sedentary jobs which she could handle if she had an interest and inclination to do so (Tr. 210).

At the conclusion of the administrative hearing, plaintiff's attorney requested that she receive additional IQ testing (Tr. 55). The ALJ agreed to plaintiff's request and the

additional test was conducted on September 27, 2004 by Julie
Uran, Ph.D. (Tr. 58, 282-84).  During the interview, plaintiff
reported that she worked as a cashier in a grocery store for
three to four years before she quit due to physical reasons
(Tr. 36, 90, 283).  Testing revealed a full scale IQ of 73, a
verbal IQ of 69, and a performance IQ of 81 (Tr. 282-84).  The
WRAT-3 revealed high school equivalent vocabulary, seventh grade
spelling, and sixth grade math skills (Tr. 284-85).

     Based on this record evidence, the ALJ found that
plaintiff was not disabled at the fifth step of the sequential
evaluation process.[2]  Specifically, the ALJ found that while
plaintiff's history of degenerative left knee joint arthritis
status post total knee replacement and L5-S1 spondylolisthesis
status post decompression and fusion with screw instrumentation,
left foot drop, bronchial asthma, obesity and borderline
intellectual functioning are considered severe, they did not meet
or equal, alone or in combination, one of the listed impairments
(Tr. 25: Finding Nos. 3, 4).

     With respect to plaintiff's intellectual functioning,
which is at issue here, the ALJ initially noted that plaintiff

---

[2]     The five-step sequential evaluation process for disability
        claims requires the Commissioner to consider, in sequence,
        whether a claimant: (1) is working, (2) has a severe
        impairment, (3) has an impairment that meets or equals the
        requirements of a listed impairment, (4) can return to his
        or her past relevant work, and (5) if not, whether he or she
        can perform any other work in the national economy.  20
        C.F.R. §§ 404.1520, 416.920.

had not alleged nor did she testify that she was disabled based
on a mental impairment and had not been diagnosed with or treated
for any psychological impairment (Tr. 19).   Although the ALJ
found that plaintiff functioned at a borderline level of
intellectual functioning as evidenced by her last two IQ tests,
he declined to conclude that she fell under the mental
retardation category or satisfied the listed impairments at 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05, finding that her most
recent verbal IQ score of 69 was inconsistent with her prior
score of 74 and with the results of the WRAT3 test which placed
plaintiff's vocabulary at a high school equivalent and spelling
at a seventh grade level (Tr. 20).  As well, the ALJ noted that
other evidence of record regarding her functional abilities was
inconsistent with a finding of mental retardation including the
fact that she was graduated from high school, received a B in
food preparation through vocational-technical school, worked for
four years as a cashier at a grocery store, has raised two sons
on her own, has a drivers license and drives 20 miles per week,
takes care of her own finances and goes grocery shopping (Tr.
20).

     The ALJ also found that plaintiff had the residual
functional capacity to perform sedentary work with a sit/stand
option, occasional postural activities, no foot pedals, no
exposure to hazards, controlled environment and unskilled low

12

stress work with one to two steps instruction, routine and
repetitive tasks, dealing primarily with things rather than
people, and entry level (Tr. 25: Finding No. 6).  Although the
ALJ found that plaintiff could not perform any of her past
relevant work, he also found, based on the VE's testimony, that
plaintiff was capable of performing a significant range of
sedentary jobs, albeit not a full range, such as hand packer, a
sorter/grader or assembler, all of which exist in significant
numbers in the national economy (Tr. 25: Finding Nos. 7, 11, 12).
Accordingly, the ALJ concluded that plaintiff was not disabled
within the meaning of the Act at any time through the date of his
decision (Tr. 25: Finding No. 13).

    C.   <u>Standard of Review</u>

       In reviewing the final decision of the Commissioner
denying a claim for DIB and SSI, the question before the Court is
whether there is substantial evidence to support the findings of
the Commissioner.  42 U.S.C. § 405(g), 1383(c)(3).  <u>Hartranft v.
Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999); <u>Monsour Medical Center
v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986), <u>cert</u>. <u>denied</u>, 482
U.S. 905 (1987).  Substantial evidence is defined as less than a
preponderance of the evidence and more than a mere scintilla; it
is "such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S.

552, 565 (1988); <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999).

A reviewing Court is bound by the Commissioner's findings of fact if they are supported by substantial evidence in the record.  <u>Id.</u>  A Court must affirm the final decision of the Commissioner if it is supported by substantial evidence, regardless of whether it would have decided the case differently had it been the trier of fact.  <u>Hartranft v. Apfel</u>, 181 F.3d at 360.

D.   <u>Discussion</u>

Plaintiff raises a single issue in her motion for summary judgment, namely, that the ALJ erred in failing to find her disabled at the third step of the evaluation process or that her mental impairments meet or equal a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4 and, in particular, § 12.05C which provides:

> Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an

> additional and significant work-related
> limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Thus, to meet the requirements of § 12.05C a claimant must 1) have a valid verbal, performance or full scale IQ of 60 through 70, 2) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and 3) show that the mental retardation was initially manifested during the developmental period or before age 22.  Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003) ("Markle").  Plaintiff argues that the ALJ erred at the first and third stages of the inquiry by rejecting plaintiff's most recent IQ scores and by finding the record devoid of evidence of difficulties in adaptive functioning prior to age 22.

As already discussed, at the behest of plaintiff's counsel, plaintiff was evaluated following the hearing by Dr. Julie Uran whose report indicated that plaintiff had a full IQ score of 73, verbal IQ score of 69 and performance IQ score of 81 (Tr. 283).  Because plaintiff had a verbal IQ score of 60 through 70, plaintiff concludes that she has satisfied the first requirement and that the ALJ erred by rejecting Dr. Uran's findings.  In particular, plaintiff argues that by agreeing to the new test the ALJ necessarily concurred that a new score was needed to conduct a proper evaluation and that the listing requires that the score be current.

We note at the outset that it does not necessarily
follow from the fact that the ALJ granted counsel's request that
an additional IQ test be performed that a proper evaluation could
not otherwise be made.  Indeed, there is nothing in the record to
suggest that plaintiff's earlier IQ score, performed in 1994 and
upon which the ALJ principally relied, was not valid.  Moreover,
contrary to plaintiff's representation, Listing 12.05C does not
require a "current" IQ score but states only that it be valid.

Most important, however, it is undisputed that "the
Commissioner is not required to accept a claimant's IQ scores and
may reject scores that are inconsistent with the record."
Markle, 324 F.2d at 186, 187.  Here, the ALJ found that
plaintiff's verbal IQ score of 69 as reported by Dr. Uran was
inconsistent with her prior verbal score of 74 and with the
results of the WRAT3 test as reported by Dr. Uran which placed
plaintiff's vocabulary at a high school equivalent (Tr. 20, 283).
The ALJ also found the recent score was inconsistent with other
evidence of record regarding her functional abilities including
the fact that she was graduated from high school,[3] received a B
in food preparation through vocational-technical school, worked
as a cashier at a grocery store for four years which she quit

---

[3]     Although plaintiff reported at the hearing and to Dr. Uran
        that she took special education classes in high school, she
        did not indicate that she attended special education classes
        in the disability report she completed in April of 2003 (Tr.
        95).

16

because of physical inability rather that intellectual limitations, raised two sons on her own, has a drivers license and drives 20 miles per week, takes care of her finances and goes grocery shopping (Tr. 20). Moreover, the ALJ noted that plaintiff never alleged a disability based on a mental impairment and did not testify to such at the hearing (Tr. 20). As such, the ALJ concluded that verbal IQ score of 69 reported in September of 2004 was invalid and gave more weight to the 1994 score of 74 which he found to be "more consistent with and reflective of the claimant's functional abilities, and the consistent and longitudinal assessments that the claimant functions at a borderline range of intellectual functioning, not at a mild mental retardation range." (Tr. 20).

In this manner, plaintiff's reliance on <u>Markle</u>, appears to be misplaced as the Court in that case did not hold, as plaintiff has suggested, that performing activities of daily living independently and managing one's own finances could never provide the basis for invalidating IQ scores. Rather, the Court merely held that the activities that the plaintiff in that case engaged in were not inconsistent with qualifying mental retardation or a full scale IQ of 70. Indeed, the record established that although Markle received a GED and was able to add and subtract he had difficulty with multiplication and division. It also appears that while he lived alone and was able

17

to shop, take care of his apartment, personal needs and finances, he had not worked for the past fifteen years and then did only "some work" painting, wallpapering and cutting grass.  Id. at 183.

Here, by contrast, plaintiff not only was graduated from high school but subsequently attended vocational school, receiving a B in food preparation.  Moreover, she worked as a cashier, without apparent mistakes in her drawer (Tr. 55), for four years prior to quitting and applying for disability which she premised solely on her physical limitations.  As well, she drives 20 miles a week and, in addition to being able to shop, takes care of her apartment, personal needs and finances, and she raised two sons on her own.  It therefore appears that plaintiff engages in far more daily activities than those performed by Markle.

As such, it appears that the facts of this case are more akin to those set forth in Clark v. Apfel, 141 F.3d 1253 (8th Cir. 1998) ("Clark"), wherein the Court of Appeals for the Eighth Circuit found that the ALJ properly rejected the validity of the claimant's performance IQ of 66 and full scale IQ of 67 where she had, like the instant plaintiff, worked in the private sector, had a driver's license, completed ninth grade and was the primary caretaker of her daughter.  Id. at 1255.  See Markle, 324 F.3d at 187.  Indeed, it is interesting to note that Clark was relied upon by the district court in Markle as providing the basis for rejecting the validity of the claimant's performance IQ

but which, upon review, the Third Circuit found distinguishable because the evidence before it, unlike in <u>Clark</u>, did not undermine the validity of Markle's reported IQ scores.  <u>Markle</u>, 324 F.3d at 187.  Because the facts of this case with respect to plaintiff's activities of daily living are more analogous to those set forth in <u>Clark</u>, it would appear that even under the Third Circuit's assessment of <u>Clark</u>, there is substantial evidence to support the ALJ's decision that plaintiff's most recent verbal IQ score was invalid.

Moreover, in <u>Markle</u> there were no other tests or opinions in evidence which contradicted the findings that Markle had a full scale IQ of 70.  In the instant case, however, the tests performed in 1994 revealed a full scale IQ of 76, a verbal IQ of 74, and a performance IQ of 82 which, as found by the ALJ, placed plaintiff within the borderline range of intellectual functioning.  It therefore does not appear that <u>Markle</u> provides the basis for finding that the ALJ erred by rejecting plaintiff's most recent verbal IQ score.

Nor does there appear to be evidence that plaintiff had difficulties in adaptive functioning prior to age 22.[4]  To

---

[4]     According to the <u>Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition</u> ("<u>DSM-IV</u>"), "adaptive functioning" refers to how effectively individuals cope with the common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.  <u>DSM-IV</u>, at 40.  Moreover, the <u>DSM-IV</u> requires significant limitation in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic

support her argument to the contrary, plaintiff points to the fact that her most recent IQ score prior to age 22, which was obtained in 1976, included a verbal IQ score of 68.  A low IQ score standing alone, however, does not, in our view, speak to "adaptive functioning."  Indeed, while a low IQ score may be suggestive of mental retardation, other factors may suggest that the metal impairment is not so severe as to rise to the level of mental retardation.  See Holland v. Apel, 153 F.3d 620, 622 (8th Cir. 1998)(Finding that "[a]n IQ test is useful in determining whether an applicant has a mental impairment, but other information in the record which indicates the individual's ability to function can be used to discredit the lone IQ score."); Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995)(Finding that other evidence of record can be examined to discredit an IQ indicative of mild retardation.)  See also Markle, 324 F.3d at 187 (Finding that IQ scores which are contradicted by other evidence of record as properly rejected.)

Here, plaintiff has not pointed to any evidence of record to suggest that her low IQ score impacted her ability to perform activities of daily living or social functioning prior to age 22.  Indeed, as argued by the Commissioner, not only is the record devoid of any reports indicating that plaintiff failed to attain mental, academic, motor, social, or personal skills at an age-appropriate level, but the record does show that she was

---

skills, work, leisure, health, and safety.  DSM-IV, at 39.

graduated from high school and went on to attend vocational technical school.

Further, as found by the ALJ, the low verbal score cited by plaintiff is inconsistent with plaintiff's IQ scores previously reported in 1967, which indicated an IQ of 85 and higher, and with her subsequent scores reported in 1994 indicating a verbal IQ of 74, a performance IQ of 82, and a full scale IQ of 76.  Moreover, even in 1976, her performance IQ was 80 and her full scale score was 72.

In addition, the record also demonstrates that the low verbal IQ score reported in 1976 is inconsistent with plaintiff's functional abilities and the objective longitudinal evidence of record which, as previously discussed, show that plaintiff was graduated from high school, went on to attend a vocational technical school, worked as a cashier, raised two sons by herself, drives 20 miles per week, takes care of her household, personal and financial needs, goes grocery shopping, does word search puzzles, and currently has high school level vocabulary skills.  It therefore appears that the ALJ properly rejected the low IQ score as reported in 1976 as well.  See Markle, 324 F.3d at 186, 187.  As such, the ALJ's finding that the objective longitudinal evidence does not show deficits in adaptive functioning before age 22 and, consequently, that plaintiff's mental impairment did not meet or equal Listings 12.05C, is also supported by substantial evidence.

Summary judgment is appropriate where there are no disputed material issues of fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c). In the instant case, there are no material issues of fact in dispute and it appears that the Commissioner's determination is supported by substantial evidence. For this reason, it is recommended that the plaintiff's motion for summary judgment (Docket No. 7) be denied, that defendant's motion for summary judgment (Docket No. 9) be granted, and that the decision of the Commissioner be affirmed.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/ *Amy Reynolds Hay*
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:   11 January, 2006.

cc:  Hon. Terrence F. McVerry
     United States District Judge

     Stanley E. Hilton, Esq.
     801 Jonnet Building
     Monroeville, PA 15146

     Rebecca Ross Haywood
     Assistant United States Attorney
     United States Attorney's Office
     700 Grant Street, Suite 400
     Pittsburgh, PA 15219

22